STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

MARLENA ALEXANDER

VERSUS

AUTOZONE, INC.

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 02
PARISH OF RAPIDES, NO. 02-00734
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Michael G. Sullivan, Judges.

AFFIRMED.

Edward J. Fonti
JONES, TETE, NOLEN, FONTI & BELFOUR, L.L.P.
P. O. Box 1930
Lake Charles, LA 70602-1930
Telephone:  (337) 439-8315
COUNSEL FOR:
        Plaintiff/Appellee - Marlena Alexander

Robert Blaine Purser
Purser Law Firm
P. O. Box 1670
Opelousas, LA 70571-1670
Telephone:  (337) 948-0815
COUNSEL FOR:
        Defendant/Appellant - Autozone, Inc.

THIBODEAUX, Chief Judge.

Marlena Alexander Gainey received a favorable award of temporary total disability benefits and penalties in this workers' compensation proceeding. Her employer, Autozone, contests the award, arguing that she did not demonstrate temporary total disability. Autozone also questions the existence of a causal link between her initial injury and her later diagnosis of carpal tunnel syndrome, which now requires surgery to correct. We affirm the trial court's award of benefits and penalties.

I.

**ISSUES**

Autozone raises three issues on appeal. First, Autozone argues that Ms. Alexander is not entitled to receive compensation for temporary total disability because she did not show she was unable to engage in any type of occupation. Second, Autozone denies responsibility for Ms. Alexander's carpal tunnel surgery, claiming she offered insufficient proof that this condition stemmed from the original employment accident. Finally, Autozone challenges the trial court's imposition of penalties for its failure to pay Ms. Alexander's medical bills.

II.

**FACTS**

Marlena Alexander Gainey worked for Autozone as a commercial driver, delivering auto supplies to customers. On October 11, 1999, while making a delivery, the starter she was lifting from her truck fell through the bottom of its box and injured her wrist. She returned to Autozone, but went to the emergency room later that night. Although the emergency room did not make a diagnosis, her family physician referred

her to an orthopedist, Dr. J. David DeLapp, who determined that her left wrist was fractured. She was put in a cast, which was later removed and replaced to accommodate swelling in her wrist. Dr. DeLapp placed her on light duty and restricted her to lifting no more than ten pounds.

On January 4, 2000, the fracture appeared to have healed, and Dr. DeLapp released Ms. Alexander to full duty. On June 27, 2000, however, Ms. Alexander returned to Dr. DeLapp with wrist pain. She also had difficulty picking up objects. Dr. DeLapp diagnosed de Quervain's Syndrome in her wrist. According to Dr. DeLapp's deposition testimony, de Quervain's Syndrome is a common and well-documented complication in wrist fractures. Her condition did not improve, and Ms. Alexander had surgery to treat her de Quervain's Syndrome on July 31. Dr. DeLapp placed her on limited duty after the surgery. On August 24, he set a six week regimen of physical therapy to further improve her wrist. By the end of November, Ms. Alexander exhibited early symptoms of carpal tunnel syndrome, including numbness and tingling. Her symptoms were very mild, however, and her Tinel's and Phalen's tests—examinations used to diagnose carpal tunnel syndrome—were both negative.

On January 17, 2001, Ms. Alexander had surgery to remove a neuroma that had developed from her injury. She also had diminished sensation and increased numbness and tingling. Although her Tinel's test remained negative, her Phalen's test was now positive. She recovered from the neuroma surgery, however, and on January 31, Dr. DeLapp released her to normal activities as tolerated. On February 16, Ms. Alexander again returned to Dr. DeLapp with a painful mass in her wrist. Dr. DeLapp diagnosed this as a ganglion cyst, also a common and well-documented

2

complication in wrist fractures, and scheduled her for surgery, as the cyst was painful and impaired Ms. Alexander's mobility.

Ms. Alexander was now experiencing pain and difficulty with everyday tasks, including work-related activities, despite extensive physical therapy and continued use of a brace. Dr. DeLapp testified that her deteriorating condition hampered her ability to perform her job. Where she once attracted management's attention for her outstanding job performance, she now experienced harassment for her frequent visits to physician's appointments and physical therapy. At different intervals during the course of her treatment, her doctor advised her to limit the amount of weight she lifted, as well as to curb repetitive motion, as that would exacerbate her carpal tunnel symptoms. Although Autozone provided some assistance with *loading* heavy equipment into her truck while at Autozone, she had no help available when she *unloaded* the same equipment upon delivery to the customer. The various equipment and parts weighed between twenty-five to sixty pounds. Her job also required daily repetitive motion, including using the computer. Because of the unrelenting pain, Ms. Alexander concluded that she was no longer able to work and resigned from her position on February 19, 2001. Although she made efforts to seek employment elsewhere, her continued pain and impairment led her to believe that she would not be able to perform any kind of work, and she discontinued her search.

Despite her hiatus from work, her wrist continued to worsen. Although Dr. DeLapp removed the first ganglion cyst, another mass developed and he diagnosed her as having a recurrent ganglion cyst. He also diagnosed her with carpal tunnel syndrome on April 27, 2001. A nerve conduction study performed in May, however, did not demonstrate carpal tunnel syndrome. Nevertheless, Ms. Alexander

continued to exhibit symptoms and returned to Dr. DeLapp in August complaining of numbness and tingling. At deposition, Dr. DeLapp stated that, although the nerve conduction test is fairly accurate, there is a recognized possibility of a false negative. In that event, the study would indicate the patient did not have carpal tunnel, although the patient suffered all the positive symptoms of the syndrome. Dr. DeLapp determined that was the case here. Ms. Alexander had worn a brace for several months, but continued to suffer numbness and tingling, particularly during any kind of repetitive activity. He concluded that the nerve conduction study had yielded a false negative and that Ms. Alexander did in fact have carpal tunnel syndrome. He recommended surgery.

Autozone, however, did not approve the surgery. By December of 2001, Ms. Alexander's condition had significantly deteriorated. Her carpal tunnel syndrome had not responded to extensive nonsurgical intervention and her wrist was painful and swollen. A year went by before Dr. DeLapp saw Ms. Alexander again. In December of 2002, he again examined her wrist and discovered that, as a result of her untreated carpal tunnel syndrome, her wrist muscles had started to atrophy. Atrophy is permanent and irreversible and will inevitably lead to progressive loss of the use of her hand. Dr. DeLapp recommended immediate surgery to treat the carpal tunnel syndrome. The sooner Ms. Alexander undergoes surgery, the sooner the atrophy can be arrested; she may yet avoid accrual of a functional deficit in the use of her thumb.

The trial court found that Ms. Alexander had suffered temporary total disability, and ordered Autozone to pay indemnity benefits. The trial court also ordered Autozone to authorize the carpal tunnel surgery. In addition, the judgment

included attorney fees and penalties for Autozone's failure to pay indemnity benefits, failure to pay certain medical bills, and refusal to authorize the surgery.

## III.

## LAW AND DISCUSSION

### *Temporary Total Disability*

The trial court found that Ms. Alexander had proved she was temporarily totally disabled, and ordered Autozone to pay indemnity benefits. Autozone, in turn, argues that Ms. Alexander offered insufficient medical evidence to show she was disabled to such an extent that she was unable to work at any kind of job. Additionally, Autozone reasons that, since she left her position at Autozone voluntarily, she was actually capable of working but simply chose not to. To the contrary, the trial court determined that Ms. Alexander presented sufficient evidence to show her condition rendered her unable to work.

Louisiana Revised Statutes 23:1221(1)(c) establishes the criteria for awarding temporary total disability benefits. The employee must show "by clear and convincing evidence . . . that the employee is physically unable to engage in any employment or self-employment . . . ." The trial court's determination that an employee has or has not fulfilled her burden of proof under the statute requires a finding of fact "governed by the manifest error or clearly wrong standard and will not be disturbed absent such a finding." *Ratliff v. Brice Bldg. Co.*, 03-624, p. 6 (La.App. 5 Cir. 11/12/2003), 861 So.2d 613, 617. The appellate court must determine "not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Newson v. Richard Spurgeon Masonry*, 03-1367, p. 2 (La.App. 3 Cir. 3/3/04), 867 So.2d 78, 81, *writ denied*, 04-839 (La. 5/14/04), 872 So.2d 523.

5

In order to receive benefits for a temporary total disability, the employee-claimant must show, by clear and convincing evidence, that she is physically unable to engage in any kind of employment. *Veazie v. Gilchrist Const. Co.*, 04-118 (La.App. 3 Cir. 6/2/04), 878 So.2d 742. Clear and convincing proof has been defined as an "'intermediate' standard falling somewhere between the ordinary preponderance of the evidence civil standard, and beyond the reasonable doubt criminal standard." *Sarrio v. Stalling Const. Co.*, 04-34, p. 7-8 (La.App. 5 Cir. 5/26/04), 876 So.2d 157, 162, *writ denied*, 04-1593 (La. 10/15/04), ___ So.2d ___. To prove a matter by clear and convincing evidence requires the employee "demonstrate that the existence of a disputed fact is highly probable [or] much more probable than its nonexistence." *Carrier v. Debarge's College Junction*, 95-18, p. 5 (La.App. 3 Cir. 9/27/95), 673 So.2d 1043, 1047, *writ denied*, 96-472 (La. 4/8/96), 671 So.2d 337. In *Jackson v. Domtar Industries, Inc.*, 98-1335, p. 6-7, (La.App. 3 Cir. 4/7/99), 732 So.2d 733, 738, *writ denied*, 99-1369 (La. 7/2/99), 747 So.2d 21, the third circuit determined that "clear and convincing" proof required "objective medical evidence of [the] disabling condition" causing his "inability to engage in any employment." Thus, the claimant must provide objective, expert testimony as to their medical condition, symptoms, pain, and treatment, in addition to personal testimony, in order to fulfill this standard. *Hurst v. Sanderson Farms, Inc.*, 02-1334 (La.App. 1 Cir. 5/9/03), 846 So.2d 954.

Dr. DeLapp testified at trial that Ms. Alexander's various complications, including the de Quervain's syndrome, the neuroma, the recurrent ganglion cyst, and the carpal tunnel syndrome, all resulted from her original injury. He also corroborated her complaints of pain, swelling, decreased sensation, and impaired mobility, testifying that her injuries caused pain "for activities of daily living and affect[ed] her work performance." Dr. DeLapp agreed that these injuries would

6

interfere with work and physical chores, such as light housework or lifting as little as ten pounds. Dr. DeLapp confirmed Ms. Alexander's complaints, stating that "[i]t's not uncommon to have pain . . . causing a great deal of disability" and that "[h]er complaints are not out of the ordinary." Finally, Dr. DeLapp agreed that Ms. Alexander's pain was extensive enough to prevent her from performing the tasks her job required of her, including using the wrist all day long, lifting objects of ten to fifteen pounds, loading and unloading a truck, waiting on customers, using heavy books to look up parts, and using a computer.

Deciding whether a claimant's pain is adequate to merit an award of benefits involves a question of fact "to be determined by the totality of circumstances." *Hilts v. Wal-Mart Stores, Inc.*, 02-1440, p. 5 (La.App. 3 Cir. 4/2/03), 842 So.2d 465, 469, *writ denied*, 03-1258 (La. 9/5/03), 852 So.2d 1036. Testimony showing the "presence of pain without proof that this pain is substantial enough to make the pursuit of employment an impossibility" is insufficient evidence under La.R.S. 23:1221(1). *Id.* In *Carrier*, 673 So.2d 1043, the third circuit reasoned that the workers' compensation claimant was entitled to benefits. He established by clear and convincing evidence he was unable to work because of disabling pain in his head, neck, shoulders and arms. His testimony was corroborated by objective medical evidence, including testimony of his treating physicians and medical reports. *Id.* Additionally, both his chiropractor and his orthopedic surgeon found that the employee's injuries were in fact capable of causing such pain, and that his complaints were credible. *Id.* The court agreed that this constituted an objective finding that the employee's complaints were genuine. *Id.* Similarly, in *Daigrepont v. Grand Casino Avoyelles*, 96-1170 (La.App. 3 Cir. 3/5/97), 692 So.2d 518, the trial court found that the employee had provided objective medical evidence of her injury, including

medical reports from her treating physician. Additionally, the court found the employee's complaints of pain "to be consistent and credible." *Id.* at 521. Finally, in *Gordon v. Sandersons Farms*, 96-1587 (La.App. 1 Cir. 5/9/97), 693 So.2d 1279, the appellate court affirmed the trial court's finding that the employee had shown his pain prevented him from working. The employee testified that his pain had been "very constant," and his medical records "reflected consistent complaints of . . . pain since the accident." *Id.* at 1285.

Ms. Alexander has provided extensive deposition testimony of her treating physician. His testimony shows that Ms. Alexander suffered debilitating pain that prevented her from working. Dr. DeLapp systematically examined each office visit and testified as to her condition throughout the time following her injury. Ms. Alexander's complaints of pain are consistent, and Dr. DeLapp substantiated these complaints. Her complaints are plausible and believable, and the trial court did not err in determining that her constant pain resulted in her inability to engage in any kind of employment, warranting an award of temporary total disability benefits.

Autozone argues that Ms. Alexander was capable of performing her work, but quit her job, and it is thus because of her own actions that she is unemployed. Ms. Alexander, however, proved that her condition caused sufficient pain to prevent her from performing the functions of her job, including using the computer and lifting heavy items. Her doctor confirmed that she was physically unable to perform these tasks. In contrast to the conditions here, the supreme court found a claimant ineligible for temporary total disability benefits when she admitted she would still be working at her former job had she not been fired. *Coats v. American Tel. & Tel. Co.*, 95-2670 (La. 10/25/96), 681 So.2d 1243. Ms. Alexander left her position because she could no longer physically tolerate the work, and felt

8

Autozone did not make an effort to accommodate her difficulties. In contrast to Dr. DeLapp's extensive testimony, Autozone's medical witness, Dr. Gidman, stated in his letter only that he would "encourage her to return to work with light lifting," but admitted that her regular job "is not acceptable due to the amount of lifting required." The third circuit agreed that an employee was not entitled to benefits when the treating physician found her able to work and a vocational services counselor specifically found available jobs the claimant would be capable of performing. *Benjamin v. Asplundh Tree Co.*, 03-913 (La.App. 3 Cir. 12/10/03), *writ denied*, 04-78 (La. 3/19/04), 869 So.2d 853. However, Autozone did not provide any evidence that there might be other appropriate jobs available to Ms. Alexander. Ms. Alexander testified she did not receive vocational counseling to help her explore positions she might be capable of performing. In any event, her treating physician has testified, and the trial court found, that Ms. Alexander was unable to work due to her painful condition.

Autozone also alleges that her physician never placed her on no-work status, but only imposed certain restrictions, such as limiting her to "light duty." Dr. DeLapp testified that it was not normally his practice to impose no-work status, but would allow time off for healing after surgery. He advised Ms. Alexander to limit activities that would exacerbate her condition, such as heavy lifting and repetitive motion, but the nature of her job required these very activities. Although she was never on no-work status, she was also never free of these limitations on her activities. Even during the time in which Ms. Alexander did not see Dr. DeLapp, she was forced to wear her brace. In determining whether the claimant has met her burden of showing she is unable to engage in any kind of employment, the trial court must weigh the totality of the evidence, both medical and lay. *Ratliff*, 861 So.2d 613. The

9

fact that Dr. DeLapp did not ever put Ms. Alexander on no-work status did not persuade the trial court that Ms. Alexander otherwise failed to provide sufficient objective medical evidence of her inability to work due to pain.

## *Carpal Tunnel Surgery*

Autozone argues that Ms. Alexander did not show that her initial work-related injury caused her carpal tunnel syndrome. Autozone argues that carpal tunnel syndrome was not diagnosed until approximately two years after the accident; testing performed on May 21, 2001 did not demonstrate carpal tunnel syndrome. Additionally, Autozone maintains that the assessment by its own expert, Dr. Gregory Gidman, establishes no relationship between her fracture and her carpal tunnel syndrome.

Dr. Gidman asserts that the onset of carpal tunnel syndrome is temporally removed from the original injury such that they are not causally related. Dr. DeLapp's depositions, however, indicate that Ms. Alexander showed signs of carpal tunnel as early as November 30, 2000. Her physical examinations thereafter consistently showed signs of carpal tunnel. On January 4, 2001, Ms. Alexander's Phalen's test was positive, indicating carpal tunnel syndrome. On April 27, 2001, Dr. DeLapp diagnosed carpal tunnel. On May 21, 2001, a nerve conduction study showed mild carpal tunnel symptoms, but did not conclusively demonstrate carpal tunnel syndrome. Dr. DeLapp concluded, however, from Ms. Alexander's symptoms and complaints of pain, numbness, and tingling, that the test had yielded a false negative. On August 21, 2001, Dr. DeLapp diagnosed carpal tunnel syndrome and recommended surgery. Over a year later, she still had not had the necessary surgery, and now suffers from atrophy of her wrist muscles.

Ms. Alexander's symptoms of carpal tunnel syndrome began as early as November 30, 2000, approximately one year after her injury. Dr. DeLapp testified that, while the nerve conduction study is normally reliable, there is an acknowledged and known possibility of a false negative. He reasonably concluded that this was the case, since Ms. Alexander's symptoms contradicted the test results. Even if Dr. Gidman's calculation that her carpal tunnel did not arise until two years after the accident is correct, however, Dr. DeLapp testified at his deposition that carpal tunnel syndrome can appear anywhere from one to two years after a fracture.

In addition, Dr. DeLapp testified to the causal relationship between the original fracture and the attendant carpal tunnel syndrome. He stated that carpal tunnel syndrome is one of the "more common entities" that occur after a wrist fracture. Carpal tunnel is normally caused by either repetitive motion or "a complication from the fracture." Although he could not say definitively which was the cause, he stated that carpal tunnel is a "known related entity to a fracture" of the type suffered by Ms. Alexander and it was "more probable than not" that her condition was caused by the fractured wrist.

For a workers' compensation claimant to satisfy his burden of proof, the testimony in its entirety must show that it is more probable than not that the work-related accident had a causal relation to the disability. *Kelley v. Stone Container Corp.*, 31,790 (La.App. 2 Cir. 5/5/99), 734 So.2d 848, *writ denied*, 99-1969 (La. 10/15/99), 748 So.2d 1150. The claimant's case must fail when the evidence "leaves the probabilities evenly balanced." *Id.* at 851. The causal connection must be proved by "a reasonable preponderance of the evidence." *Sarrio v. Stalling Const. Co.*, 876 So.2d 157, 160. Dr. DeLapp testified to more than even odds that the fracture caused

11

her carpal tunnel syndrome. The trial court found Ms. Alexander's evidence more than adequate to show causation.

Furthermore, Dr. Gidman based his assessment of Ms. Alexander's condition on one examination only. Dr. DeLapp, on the other hand, saw Ms. Alexander regularly for two years, beginning with her original injury. The trial court had the discretion to discount Dr. Gidman's opinion. Normally, "[t]he general rule is that the testimony of a treating physician should be accorded greater weight than that of a physician who examines a patient only once or twice." *McKinney v. Coleman*, 36,958, p. 5 (La.App. 2 Cir. 3.14.03), 839 So.2d 1240, 1244. The treating physician has the advantage of familiarity, since he or she "is more likely to know the patient's symptoms and complaints due to repeated examinations and sustained observations." *Halker v. Am. Sheet Metal*, 03-678, p. 7 (La.App. 3 Cir. 12/10/03), 861 So.2d 740, 746. Even in light of the presumption in favor of the treating physician, however, the trial court weighed Autozone's medical evidence and found Dr. Gidman's conclusions unpersuasive. The trial court discussed Dr. Gidman's findings extensively in its oral rulings, noting that Dr. Gidman had not read Dr. DeLapp's depositions. Thus, the trial court did not simply choose to accept Dr. DeLapp's analysis of Ms. Alexander's condition, but impressively and carefully assessed the evidence of both physicians. *Longoria v. Brookshire Grocery Co.*, 37,975, p. 10 (La.App. 2 Cir. 12/19/03), 862 So.2d 1172, 1179.

The trial court found Autozone's refusal to approve Ms. Alexander's carpal tunnel surgery unreasonable. The evidence satisfied the trial court of the connection between her original injury and the subsequent carpal tunnel condition, and thus the court did not err when it assigned responsibility to Autozone for the surgery to treat this condition. Once the surgery is completed, she will have a short

recovery period followed by physical therapy. Dr. DeLapp testified that Ms. Alexander should be able to return to work once she has recovered from surgery. If she does not have the surgery, she will suffer continued atrophy of the muscles in her hand, and will eventually suffer disability in that hand, in essence extinguishing her chances of returning to work. The procedure therefore is clearly necessary for her to overcome her disability and return to work.

### *Penalties for Unpaid Medical Bills*

The trial court awarded Ms. Alexander a total of $12,000.00 in penalties and $17,000.00 in attorney fees. Louisiana Revised Statutes 23:1201 was amended in 2003 to include a provision capping total penalties at $8,000.00. In workers' compensation matters, however, we apply the law in existence at the time of the injury. At the time of Ms. Alexander's injury, there was no limit on the total amount of penalties. Autozone argues that each of these awards represents manifest error on the part of the trial court. The trial court imposed $6,000.00 in penalties for Autozone's failure to pay three medical bills totaling $928.65. In addition, the trial court also awarded a $4,000.00 penalty and $10,000.00 in attorney fees for Autozone's failure to pay temporary total disability benefits. Finally, the trial court awarded Ms. Alexander a $2,000.00 penalty and $7,000.00 in attorney fees for Autozone's failure to authorize the carpal tunnel surgery.

Louisiana Revised Statutes 23:1201 governs the procedure for payment of workers' compensation benefits. Subsection (E) requires payment of medical bills "within sixty days after the employer or insurer receives written notice thereof." Subsection (F) describes the assessment of penalties for the failure to pay these benefits, and sets the maximum payment per penalty at $2,000.00 per claim. The sole exception to La.R.S. 23:1201(F) states "[t]his [s]ubsection shall not apply if the claim

is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control." La.R.S. 23:1201(F)(2).

The Louisiana supreme court has interpreted "reasonably controverted" to require that "the defendant . . . have some valid reason or evidence upon which to base his denial of benefits." *Brown v. Texas-La Cartage, Inc.*, 98-1063 (La. 12/1/98), 721 So.2d 885. The third circuit adopted this explanation in *Johnson v. Transamerican Waste Co.*, 99-190 (La.App. 3 Cir. 6/2/99), 741 So.2d 764. The claimant sought penalties for the failure of his employer to pay workers' compensation benefits. The employer asserted that it reasonably controverted the employee's claim to benefits, and the claimant was therefore not entitled to penalties. The third circuit stated that "[i]n order to avoid the imposition of penalties, an employer must reasonably controvert the workers' compensation claimant's right to benefits. The test to determine if the employer has fulfilled its duty is whether the employer or his insurer had sufficient factual and medical information presented by claimant." *Id.* at 770. The court held that the employer offered no valid reason to contradict the claimant's account of his injury, and no medical evidence to suggest the claimant's injures were not disabling. Thus, the employer failed to present sufficient information to controvert the employee's claim for temporary total disability benefits. *Id*.

Thus, the critical focus in deciding to allocate penalties or attorney fees is whether the employer had an articulable, reasonable, and objective rationale for denying benefits sufficient to overcome the employee's claim to benefits. *Authement v. Shappert Eng'g*, 02-1631 (La. 2/25/03), 840 So.2d 1181; *Galeano v. Taco Bell Corp.*, 02-904 (La.App. 5 Cir. 2/25/03), 839 So.2d 472. This issue requires an analysis of facts explaining the denial of the employee's claim. Therefore, the trial

14

court's decision should not be disturbed on appeal absent manifest error, or unless clearly wrong. *Authement*, 840 So.2d 1181; *Frank v. Kent Guidry Farms*, 01-727 (La.App. 3 Cir. 5/8/02), 816 So.2d 969, *writ denied*, 02-1608 (La. 6/27/03), 847 So.2d 1273; *Johnson v. Johnson Controls, Inc.*, 38,495 (La.App. 2 Cir. 5/12/04), 873 So.2d 923.

Ms. Alexander testified that she called Autozone's corporate office several times regarding the unpaid bills, but continued to receive collection notices. The manager at her store, Louis Clinkscales, testified that his only responsibility was to forward information regarding any workers' compensation claim he received from an employee to Troy Calhoun, the regional manager. Ms. Alexander further testified that she spoke to Mr. Calhoun about the unpaid bills several times, and he promised to call the corporate office on her behalf. By the time the case reached trial, the bills were seriously overdue. Autozone asserts that their failure to pay represents a mere administrative oversight, particularly in light of the many other bills they had successfully paid.

Administrative error, however, does not establish a reasonable explanation for their failure to pay these bills. Autozone had no good reason for overlooking these bills but paying others, since there is no doubt that the treatment represented by each bill was related to Ms. Alexander's injury. Autozone does not argue it did not receive notice of the bills; in fact, Autozone admits that it received paperwork regarding many bills, and only argues that these three specific bills were inadvertently overlooked. Also, Autozone cannot argue that the mistake arose from a situation beyond their control, since they successfully paid other bills. Additionally, Louisiana jurisprudence has specifically rejected administrative error as sufficient to overcome the claimant's right to benefits. In *Arnold v. Wal-Mart Stores, Inc.*, 03-609

15

(La.App. 3 Cir. 11/5/03), 858 So.2d 776, *writ denied*, 03-3347 (La. 3/19/04), 869 So.2d 850, the court found that Wal-Mart did not provide any evidence that the clerical mistake that caused the claimant's benefits to go unpaid resulted from circumstances beyond the employer's control. The third circuit found that Wal-Mart's excuse did not sufficiently controvert the employee's right to benefits, and the claimant was therefore entitled to penalties and attorney's fees. *Id.* Autozone's only basis for its failure to pay these particular bills is clerical error, which does not controvert Ms. Alexander's right to have her medical bills paid. Thus, Autozone violated the provision of La.R.S. 23:1201 requiring payment of medical bills within sixty days of receiving notice, and is therefore subject to penalties under La.R.S. 23:1201(F).

Autozone also contests the trial court's award of penalties for its failure to award benefits for Ms. Alexander's temporary total disability. Autozone asserts Ms. Alexander is not entitled to temporary total disability benefits, and therefore it cannot be sanctioned for failing to pay her these benefits. Autozone argues that it was not unreasonable for it to take the position that she had not sufficiently proven her right to claim these benefits as required by La.R.S. 23:1221(1)(c). The trial court, however, concluded at its oral rulings that Ms. Alexander had satisfied her burden of proving her disability. The court reviewed the weight of medical evidence in favor of Ms. Alexander, showing that her injury rendered her incapacitated, and found that Autozone's arguments did not controvert her claim.

Autozone also disputes the penalties assigned for its failure to authorize carpal tunnel surgery. Louisiana courts have uniformly agreed that "failure to authorize a medical procedure for an employee eligible to receive workers' compensation is deemed to be a failure to furnish compensation benefits, thereby

triggering the penalty provisions of the Louisiana Workers' Compensation Act." *Frank*, 816 So.2d at 972; *Authement*, 840 So.2d 1181. Therefore, "the period of time in which the employer or insurer must act is sixty days, as provided in La.R.S. 23:1201(E)," and if the employer fails to comply, it is subject to penalties under La.R.S. 23:1201(F), even though the language of the statute refers to the "[f]ailure to provide payment" rather than necessary medical procedures. *Harbor v. St. Frances Cabrini Hosp.*, 01-1551 (La.App. 3 Cir. 5/15/02), 817 So.2d 1269, 1273. The penalties and attorney fees are due unless the claim is reasonably controverted or such nonpayment results from conditions over which the employer or insurer had no control. *Frank*, 816 So.2d 969.

Autozone maintains that Ms. Alexander's original work-related injury did not cause the carpal tunnel syndrome, and it is therefore not obligated to fund her surgery. The trial court, however, determined that the medical evidence established beyond a preponderance of the evidence that her initial fracture ultimately resulted in her carpal tunnel condition. Thus, Autozone did not reasonably controvert Ms. Alexander's claim and is subject to penalties for its failure to authorize and fund the surgery.

Finally, Autozone challenges its obligation to pay Ms. Alexander's attorney fees. In addition to providing for penalties for the employer's failure to pay benefits, La.R.S. 23:1201(F) also permits an award of attorney fees. This component of the statute also does not apply if the employer reasonably controverts the employee's claim. La.R.S. 23:1201(F)(2). Because "[a] workers' compensation judge is given great discretion in determining whether to award attorney's fees," his or her ruling will be reversed on appeal only in case of manifest error. *Semere v. Our Lady of Lourdes Hosp.*, 03-1702, p. 14 (La.App. 3 Cir. 6/29/04), 875 So.2d 1048,

17

1057. The third circuit established different factors to consider when awarding attorney fees: "While the legislature has set statutory limits on the amount of penalties which may be awarded, the legislature has made no such limitation on the amount of attorney fees which may be awarded. The legislature's only mandate is that such attorney fees be reasonable. In setting reasonable attorney fees, the supreme court has advised us to consider 'the degree of skill and ability exercised, the amount of the claim, and the amount recovered for the plaintiff, and the amount of time devoted to the case." *Id.* (citation omitted).

Ms. Alexander's attorney began work on this case in January of 2002, when he first filed her disputed claim for worker's compensation. He conducted depositions and appeared in court. The case is factually dense and involved extensive medical testimony. He achieved a good result for his client. The attorney fees awarded to Ms. Alexander are not unreasonable and do not indicate manifest error. The purpose of awarding penalties and attorney fees in workers' compensation cases is to punish noncompliance with the statute and "to discourage indifference and undesirable conduct by employers and insurers." *Authement*, 840 So.2d at 1188. The trial court did not err in its decisions to award penalties and attorney fees for Autozone's unwarranted failure to provide Ms. Alexander with the benefits to which she is entitled under law.

IV.

**CONCLUSION**

For the above reasons, the judgment of the trial court is affirmed. Costs of appeal are assessed to appellant Autozone, Inc.

**AFFIRMED.**

18